## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-3205 |
| | ) | |
| BLACKBURN COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on the Motion for Summary Judgment (Motion) of Defendant Blackburn College (Blackburn). See d/e 118. For the reasons that follow, Defendant's Motion is GRANTED with respect to Plaintiff's claims under Title IX of the Education Amendments of 1972 (Title IX) (20 U.S.C. § 1681). Further, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## I. BACKGROUND

On January 17, 2011, Plaintiff, Jane Doe, filed her First Amended Complaint for Damages (d/e 10) (Amended Complaint). The Amended Complaint alleges

both federal and state law claims stemming from a sexual assault of Plaintiff by an unidentified person while she was a student at Blackburn. Plaintiff's federal claims are brought under Title IX. The Amended Complaint alleges two counts under Title IX, one alleging sexual harassment and one alleging sex discrimination. The count alleging sexual harassment alleges Blackburn is liable under Title IX because of Blackburn's deliberate indifference in failing to protect Plaintiff before and after the sexual assault. The count alleging sex discrimination is similar to the sexual harassment claim in that it also alleges Blackburn discriminated against Plaintiff by allowing her to be sexually harassed and telling her that Blackburn could not protect her. The only real difference in the two counts is that the sex discrimination count also alleges Blackburn failed "to establish an appropriate grievance procedure for sexual assault and steps to correct it."

The ultimate questions, with respect to the Title IX claims, are whether Blackburn is liable under Title IX for its: (1) failure to prevent the sexual assault or (2) unreasonable response to the sexual assault. Therefore, the Court will set forth the undisputed facts that are relevant to the time period up to and including the sexual assault and after the sexual assault. Those undisputed facts are as follows.

### A. Facts Leading up to and Including the Sexual Assault of Plaintiff

Blackburn is a small college with about 600 students in Carlinville, Illinois.

Plaintiff began taking classes at Blackburn in 2000 and lived off campus. Plaintiff received a copy of Blackburn's student handbook, which was included with an academic calendar known as the "B Book." The B Book provided Blackburn's Security Policies and Procedures and directed students who desired information regarding crime statistics on campus to Blackburn's website. Additionally, the B Book set out Blackburn's harassment policy and its grievance procedures for complaints of sexual harassment.

Blackburn has a Security Department, and Randy Ober was the Director of Security at Blackburn during Plaintiff's tenure as a student. Blackburn used student security workers who were typically criminal justice majors chosen because of their interest in criminal justice. In 2001-2002 Blackburn had no monies budgeted for the Physical Plant Maintenance Department for Security and its actual expenditure was $1,097. In 2002-2003 Blackburn's requested operating budget for the Physical Plant Maintenance Department for Security was $2,700. In 2003-2004, an operating budget for the Physical Plant Maintenance Department for Security of $4,275 was requested but only $2,403 was approved.

Mr. Ober and the Security Manager, Assistant Manager, and Department Crewheads were responsible for the day-to-day operations of the Security Department in 2004. The Security Manager met daily with Mr. Ober to discuss

what had occurred the evening before, upcoming special events, scheduling, and any problems. The Security Manager, Assistant Manager, Crewheads, and Mr. Ober also met weekly. Mr. Ober conducted training for the security staff, including training regarding locking and unlocking buildings, special event security, escort services for students, patrolling the campus, responding to fire alarms, use of the Security Department's radio and telephone, and administering breathalyzer tests. Security personnel were also given Blackburn's Campus Security Guidelines. In 2004, the year of Plaintiff's assault, there were fourteen students working in security for Blackburn. In addition to the Security Department, the Student Life Department also shared responsibility for security.

While not alleged in her original Complaint or Amended Complaint, Plaintiff discusses in her submission to the Court on summary judgment "an issue" she had with Jake Miller, a psychology professor at Blackburn. Plaintiff alleges Professor Miller told her that he was "dying" to kiss her one day after class. Plaintiff's last class with Mr. Miller was in the Spring of 2003, making her last class with him in May 2003. Mr. Miller had never done anything inappropriate previously, and after Plaintiff laughed at his suggestion, he "kind of backed down" and "nothing ever happened."

Plaintiff alleges that she went to Jeff Aper, the Provost, and told him that

Mr. Miller had been inappropriate in the classroom and had wanted to kiss her. Plaintiff testified that Mr. Aper said that another student had to complain before the situation would be pursued. Plaintiff does not know if Mr. Aper spoke to Mr. Miller. Mr. Aper recalled a female student, who wished to remain anonymous, telling him that there was an issue with Mr. Miller allegedly saying that he was dying to kiss the student. Mr. Aper told Mr. Miller that a student who wished not to be identified had reported unacceptable behavior on his part and he had to discontinue any behavior of that type immediately. According to Mr. Aper, Mr. Miller was shocked and apologetic. Plaintiff had no further issues with Mr. Miller. Plaintiff asserts that Angie Behne, another student, had the same type of problem with Mr. Miller, but Plaintiff did not recall the nature of Ms. Behne's allegation. Plaintiff is not aware of Ms. Behne making any complaints regarding Mr. Miller, but she alleges that she told Mr. Aper that there had been an issue with another student, while not identifying the student.

Plaintiff also alleges instances of sexual misconduct, of which Blackburn was aware, that occurred on campus in the year leading up to the assault of Plaintiff. On October 20, 2003, a girl working for a pizza delivery service reported being sexually harassed when the dorm room to which she was supposed to deliver had a message reading "Pizza girl-Don't knock come in-Will you get naked for my

buddies for an 8-ball of cocaine." One month later, on November 3, 2003, Mr. Ober made a complaint with the Carlinville police department that a male "prowler" was on campus trying to get a female working in a lab by herself to unlock the door by telling her he was not going to kill her.

A police report indicates a rape occurred by a known individual in a dorm room in February 2004. The victim chose not to press charges and requested that only Mr. Ober know of the incident and that no paperwork regarding the incident be given to Blackburn or anyone else.

On May 21, 2004 a Blackburn student reported a stalker to the Carlinville police department. The victim of the stalking knew the stalker. Moreover, she reported that Blackburn security had records of other stalking incidents involving the stalker. The stalker, an ex-student, had previously been arrested for trespassing on Blackburn property on March 11, 2004.

On September 2, 2004, two weeks before Plaintiff was raped, a Blackburn student reported being sexually assaulted on Blackburn's campus. The victim of this assault was able to identify her alleged attacker.

On September 30, 2004, the Illinois State Police interviewed a female student who indicated that she had been assaulted on August 29, 2004 in an area

behind Olin Science Building.[1] The victim of the August 2004 assault had not previously reported the assault. The victim could not recall details or a description of the assailant and stated that she threw away all of her clothing and undergarments after the assault.

On September 16, 2004, Plaintiff was sexually assaulted on Blackburn's campus between 8:30 p.m. and 9:00 p.m., after leaving the library to get fresh air around 8:20 p.m. As Plaintiff walked past the old art building while smoking a cigarette she heard a man's voice, but did not recall what she heard the man say. Later, between 8:30 p.m. and 9:00 p.m., Plaintiff alleges that she was walking on the Physical Plant road when a man came up behind her at the bottom of a small hill just past the Physical Plant and struck her with a blunt object in her right eye. After hitting Plaintiff, the assailant dragged her to a wooded area on the side of the hill and sexually assaulted her. The Physical Plant building was approximately 500 to 700 feet from the location where the assault occurred.

### 2. *Facts Occurring Immediately After the Sexual Assault of Plaintiff and During the Months that Followed*

After the assault, Plaintiff went back to her car and called her friend Amanda Matthews. They decided to go to the apartment of Amber Daulbaugh, the

---

[1] While this is included in the allegations of prior instances of sexual assault, Blackburn did not know of this incident at the time of Plaintiff's assault because the victim of the prior assault did not report the assault until after Plaintiff had been assaulted.

women's basketball coach. Once there, they called Chief David Haley of the Carlinville police department, who is also Plaintiff's family friend. Chief Haley discussed Plaintiff's options with her and told her that he thought she should have a rape kit completed. Ms. Daulbaugh contacted Robert Weis, the College Counselor, who lived in the same apartment complex. Mr. Weis holds a masters degree in counseling, and his duties include providing education and training regarding rape and harassment and counseling victims of rape and harassment.

Pursuant to Blackburn's procedures, Mr. Weis notified the school's professional on duty that evening, Dennis Blanchard (Director of Resident Life), regarding the reported assault. Mr. Weis and Mr. Blanchard discussed that there had been a reported sexual assault on campus, that Mr. Weis would assess the situation with Plaintiff, and that Mr. Blanchard would see what needed to be done on campus to coordinate with the Carlinville Police Department. Mr. Weis then went to Ms. Daulbaugh's apartment, where Plaintiff, Chief Haley, Ms. Matthews, and Ms. Daulbaugh were present. After making certain Plaintiff was comfortable with him accompanying them, Mr. Weis went with Plaintiff, Chief Haley, Ms. Daulbaugh, and Ms. Matthews to the Carlinville Police Department where Plaintiff was dusted to see if the assailant's fingerprints could be located.

After going to the police station, Mr. Weis accompanied Plaintiff and the

others to campus so that Plaintiff could identify where the assault occurred. Mr.

Ober learned about the assault from Zach Spaur, the Security Manager, and went to

the Security office at around 10:45 p.m. to meet with Dennis Blanchard, Officer

Kevin Naugle of the Carlinville Police Department, and Mr. Spaur. Officer

Naugle, Mr. Ober, Mr. Spaur, and Mr. Blanchard met Plaintiff, Chief Haley, and

Carlinville Police Detective Gary Sanson between 11:30 p.m. and 11:45 p.m. on

the road where Plaintiff alleges that she was taken so that Plaintiff could identify

the site of the assault. Mr. Ober stayed on campus with the local police until 2:30

a.m. on September 17, 2004. After leaving campus, Plaintiff, Ms. Daulbaugh, Ms.

Matthews, and Mr. Weis went to the hospital to have the rape kit completed and

then returned to Carlinville.

On September 17, 2004, Mr. Ober spoke with security staff to see if they had

noticed anything unusual the prior evening. Mr. Ober completed a Field Report

regarding the assault.

The results of the rape kit did not identify any semen, and the only DNA

identified belonged to Plaintiff. The identity of Plaintiff's assailant remains

unknown.

The evening of the assault, Mr. Weis arranged to meet with Plaintiff for

followup meetings. Mr. Weis saw Plaintiff for 8 to 10 counseling sessions from

after the assault until December of 2004 when Plaintiff discontinued the sessions. Blackburn also coordinated with the Carlinville police department to try to determine any potential threats, met with the students to encourage safe practices with regard to moving around campus, reminded students of the campus escort program, and reminded students of the importance of locking up. Moreover, Blackburn had town hall meetings with students regarding safe practices, and Plaintiff went to one of the town hall meetings that Blackburn held after the assault was reported to remind students of safety protocols. Mr. Weis and Heidi Heinz (the Dean of Students) met with Plaintiff and offered Mr. Weis as a resource for any issues Plaintiff might have and to talk about resources outside of campus for dealing with the assault. On September 24, 2008, Special Agent Scott Gaffner of the Illinois State Police interviewed Plaintiff. Blackburn also conducted a training seminar regarding self-defense techniques in October of 2004. Blackburn also participated in the clothesline program to educate regarding sexual assault.[2] Additionally, Blackburn included training regarding sexual relationships in its Student Life events and provided training to its student athletes regarding sexual assault.

---

[2] Exhibit S states that "[t]he 'Clothesline' Project is a visual display that calls attention to violence against women. The project focuses on providing healing for survivors of violence, educating the public about violence, and providing solutions through individual action to prevent violence.

In October of 2004, Dean Heinz advised Mr. Ober that a second female student had just reported that she had been sexually assaulted on campus in August of 2004 (the August 2004 assault referenced earlier), but Mr. Ober was not given any further information with regard to the second student's report that she had been sexually assaulted.

On November 1, 2004, an email originating from Plaintiff's email account was sent to Travis Neel, the editor of Blackburn's student newspaper. The email purports to give Plaintiff's version of the assault she suffered on September 16, 2004. The email states, "[f]or everyone who thinks that this assault could have been prevented by better lighting or more security, you're mistaken. Blackburn has done everything to help me and other students feel safer on campus. It is not because of lack of lighting that this happened; it is the fault of the man who did this to me." Plaintiff disputes that this email was authored by her alone. She alleges that, during a counseling session, Mr. Weis suggested that she add the portion regarding the lighting not being at fault when they discussed the statement during their counseling sessions.

Plaintiff agreed to view photos of male Blackburn students to see if she could identify the assailant. On November 24, 2004, the male students identified by Plaintiff as potentially being her assailant were interviewed by Illinois State

Police Sergeant Scott Gaffner and Detective Sanson, who found that the male students were not believed to have any involvement in the alleged assault.

Also in November of 2004, Plaintiff was staying at Ms. Matthews' home and had her car parked out front when she alleges that she went outside to find a pair of underwear on the windshield of her car. Ms. Matthews testified that when Plaintiff allegedly found the underwear on her windshield, Plaintiff said that they were the underwear that she wore the night of the assault. Ms. Matthews lived off-campus, and the incident occurred off-campus. Plaintiff reported finding the underwear to Chief Haley.

Plaintiff did not recall ever asking Blackburn for additional security. Further, Plaintiff has no plan to pursue criminal charges against her assailant.

Blackburn sent a letter to Plaintiff on December 21, 2004, informing her she would be ineligible to enroll for the Spring 2005 semester due to poor grades. Blackburn told Plaintiff her only recourse was to write a letter to the Committee on Academic Standing in care of the Records office that must be received within 16 days of the date Blackburn mailed the letter. On January 5, 2005, Plaintiff sent a letter to Blackburn's Committee on Academic Standing indicating that she had been unable to finish her schoolwork because of the assault. Ms. Pride spoke to Dr. Greg Meyer, Plaintiff's advisor, and the Committee on Academic Standing to

find a way for Plaintiff to complete her coursework.  The Committee agreed that

Plaintiff could complete her coursework off campus.  Mr. Weis was working with

Plaintiff to set up ways for Plaintiff to complete her coursework and finish her

degree.  On January 7, 2005, Plaintiff's counsel wrote to Blackburn and directed

that all communications go through her, rather than Plaintiff.  After receiving the

letter, Blackburn did not believe that its representatives were allowed to

communicate with Plaintiff regarding her coursework.  On February 7, 2005, Ken

Sommers with Constitution State Services sent a letter on behalf of Blackburn,

noting that arrangements had been made to work with Plaintiff to complete her

coursework which were halted due to Plaintiff's attorney's letter, and asking

Plaintiff's attorney to agree that the College could continue to work with Plaintiff

to complete her degree.  Blackburn never received an agreement from Plaintiff's

counsel.

Jack Dowling has been an expert witness in approximately 50 cases,

representing the plaintiff about 40 percent of the time.  On September 28, 2010,

Dowling made a report assessing security at Blackburn for Plaintiff and her

attorney after reviewing relevant documents in the case and visiting the campus.

Dowling noted that it has been studied and conclusively supported for 30 years that

females on a college campus are particularly vulnerable to the inherent risk of

crime activity by both people in the campus community and people from outside elements. Mr. Dowling noted that Blackburn had knowledge of females being disproportionately affected by crimes, especially crimes of rape and other sexual assault, after reviewing informational materials, documents Blackburn had put in its handbook, and information presented to football players. Dowling used The International Association of Campus Law Enforcement Administrators (IACLEA) guidelines. These guidelines have set standards for reasonable levels of campus security since 1995. Dowling also used the guidelines set by the Illuminating Engineering Society of North America (IESNA) to assess the lighting in the area where Plaintiff was attacked. On September 22, 2010, Dowling used the industry standard equipment to assess the lighting in the area where Plaintiff was attacked and found the lighting measurements only averaged 0.66 footcandles, well below the 1.0 recommended. Dowling opined a lack of adequate lighting denied Plaintiff the physical and psychological crime deterrent associated with this vital security requirement. Dowling further noted that lighting is one of the most cost-effective safety measures. Dowling noted that the lowest readings as a result of his inspection occurred in the area where the rape took place. Dowling found defects in the landscaping where shrubbery was higher than 3 feet from the ground and lower tree branches were below 8 to 10 feet above the ground. Dowling opined

that these conditions provide a place for concealment for potential assailants. Dowling also opined that Blackburn could have remedied its landscaping issues by installing a chain link fence.

On July 8, 2011, Defendant filed its motion for summary judgment. The motion is fully briefed, and the Court now issues this Opinion. For the reasons that follow, the Court will grant Blackburn's Motion with respect to Plaintiff's claims brought under Title IX.

## II. JURISDICTION AND VENUE

The federal questions posed by Plaintiff's Amended Complaint give this Court subject matter jurisdiction. See 28 U.S.C. §1331. The Court has jurisdiction over the remaining state claims pursuant to its supplemental jurisdiction. See 28 U.S.C. § 1367(a). Personal jurisdiction and venue requirements are satisfied because the relevant acts occurred in this judicial district. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (personal jurisdiction exists where a defendant "purposefully avail[ed] [himself or herself] of the privilege of conducting activities" in the forum state); 28 U.S.C. §1391(b) (venue is proper in a judicial district where any defendant resides, if all defendants reside in the same State).

## III. ANALYSIS

## A. *Legal Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also, Fed.R.Civ.P. 56(c). A moving party must show that no reasonable fact-finder could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997). Facts must be viewed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn for the non-movant. See Trentadue v. Redmon, 619 F.3d 648, 652 (7th Cir. 2010).

## B. *Title IX Claims*

Plaintiff's Amended Complaint contained two claims under Title IX, and various state law claims for relief. One of the Title IX claims alleged sexual harassment, while the other alleged sex discrimination. The only discernable difference between the two claims is that the sex discrimination claim alleges an improper grievance policy. Because Plaintiff's sex discrimination claim under Title IX will be stricken as duplicative of Plaintiff's sexual harassment claim, the

Court will address only Plaintiff's sexual harassment claim.[3]

Title IX liability generally flows from two periods of harassment: (a) when a school exhibits deliberate indifference before a harassing attack in a way that makes the student more vulnerable to the attack itself; or (b) when the school exhibits deliberate indifference after the attack which causes the student to endure additional harassment. <u>Snethen v. Bd. of Pub. Educ. for Savannah</u>, No. 406CV259, 2008 WL 766569, at *2 (S.D. Ga. March 24, 2008). Plaintiff's sexual harassment claim is no different. Plaintiff seeks to impose liability under Title IX on Blackburn for its failure to prevent the sexual assault on Plaintiff and for its deliberate indifference after the attack. Plaintiff also alleges that Blackburn had an "institutional policy of indifference." According to Plaintiff, all of these factors created a hostile educational environment.

However, as will be discussed below, the undisputed facts in the record demonstrate that Blackburn did not have actual knowledge of any prior sexual harassment of Plaintiff[4] or of any harassment of others that put Blackburn on notice that the risk of an assault like the one on Plaintiff was increased. Moreover,

---

[3] This will be discussed later in the opinion.

[4] While not mentioned in her amended complaint, Plaintiff's Response discusses an incident with one of her professors. However, as will be discussed below, this incident does not give rise to liability under Title IX for Blackburn.

Plaintiff cannot show Blackburn had control over the harasser/assailant. Finally,

Plaintiff's cannot show Blackburn's response to the sexual assault amounts to

deliberate indifference or was clearly unreasonable in light of the known

circumstances. For these reasons, the Court will grant Blackburn's Motion.

### 1. Governing Principles of Title IX Claims

Title IX was enacted by Congress to prevent federally funded educational

institutions from discriminating on the basis of sex. See Cannon v. Univ. of

Chicago, 441 U.S. 677, 704 (1979). To that end, Title IX provides, in part, that

"no person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20

U.S.C. § 1681(a).

Title IX's implied right of action allows a student who has been sexually

harassed by another student (Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629

(1999)) or a teacher (Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998))

to bring suit against recipients of federal education funds. In either case, "[a]

sexual harassment claim brought under Title IX cannot succeed unless the

defendant was deliberately indifferent in the face of acts of harassment of which it

had knowledge, regardless whether the claim is brought against teachers or against

students." <u>Adusumilli v. Ill. Inst. of Tech.</u>, No. 98-3561, 1999 WL 528169, at *1 (7th Cir. 1999) (citing <u>Gebser</u>, 524 U.S. at 290 (school district is only liable under Title IX for sexual harassment perpetuated by a teacher if a district official has actual notice of the misconduct)); <u>Davis</u>, 526 U.S. at 646-47 (same for student-on-student harassment)).

Deliberate indifference is "[a] response that is 'clearly unreasonable in light of the known circumstances.'" <u>Burwell v. Pekin Cmty. High Sch. Dist. 303</u>, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002) (quoting <u>Davis</u>, 526 U.S. at 648-49). To display deliberate indifference, the recipient of federal funds must first have "actual knowledge" of the sexual harassment. <u>Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.</u>, 593 F.3d 507, 512 (7th Cir. 2010) (citing <u>Gebser</u>, 524 U.S. at 290).

"In addition to actual knowledge, the [recipient] must have 'substantial control over both the harasser and the context in which the known harassment occurs.'" <u>Doe-2</u>, 593 F.3d at 512 (quoting <u>Davis</u>, 526 U.S. at 645). This substantial control element is essential to a Title IX claim because a recipient of federal funds cannot be liable for its indifference to sexual harassment that it had no authority to prevent. <u>Doe-2</u>, 593 F.3d at 512 (citing <u>Davis</u>, 526 U.S. at 644). The recipient's "deliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse." <u>Doe ex rel. Doe v. White</u>, No.

08-CV-2169, 2009 WL 268823 at *16 (C.D. Ill. February 3, 2009) (citing <u>Davis</u>,

526 U.S. at 645).  In an appropriate case, courts may identify a response as not

"clearly unreasonable" as a matter of law.  <u>Davis</u>, 526 U.S. at 649.

*2.  Blackburn is Not Liable Under Title IX for the Failure to Prevent the Sexual
Assault of Plaintiff*

As set forth above, to succeed on a Title IX claim for discrimination based

on sexual harassment, the plaintiff must demonstrate that the school was

deliberately indifferent to acts of harassment of which the school had "actual

knowledge" and that the school had substantial control over the harasser and the

context in which the known harassment occurred.  <u>Doe-2</u>, 593 F.3d at 512.  Here,

Blackburn lacked both "actual knowledge" of the harassment and the requisite

control over the harasser.

*i.  Blackburn Lacked the Actual Knowledge Necessary Under Title IX*

Many Title IX "cases turn on whether a school had notice of the

complained-of harassment."  <u>Snethen</u>, 2008 WL 766569, at *2.  As alluded to

above, to be liable under Title IX for discrimination based on sexual harassment, a

school official "with the authority to take action must have had actual knowledge

of the misconduct and must have been deliberately indifferent to it."  <u>Doe 20 v. Bd.</u>

<u>of Educ. of Cmty. Unit Sch. Dist. No. 5</u>, 680 F. Supp. 2d 957, 970 (C.D. Ill. 2010).

Plaintiff maintains she has met the "actual knowledge" requirement and cites

several on campus occurrences that she alleges gave Blackburn the required notice. In part, Plaintiff states that "[i]n 2003 and 2004, Blackburn failed to notify its students that crimes against females [had taken place,] such as multiple stalkings, a prowler, multiple sexual assaults as well as an offer made in a dorm by male Blackburn students to give cocaine to a female pizza delivery worker in exchange for her disrobing in front of them."[5]  The question here is whether Blackburn's knowledge of these prior incidents constitutes "actual knowledge" of misconduct that would create a risk that Plaintiff would be sexually assaulted that was "'so great that they [were] almost certain to materialize if nothing [were] done.'"  See Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp., 551 F.3d 599, 605-06 (7th Cir. 2008) (quoting Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004) (abrogated on other grounds in Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009)).  The answer to that question is "No."

The Seventh Circuit, and most other courts,[6] have held that the prior

_____

[5] As support for this statement, Plaintiff cites page 77, lines 4–10 of Defendant's Exhibit C, which is Mr. Ober's deposition.  The Court has reviewed that section of Mr. Ober's deposition, and that citation does not support Plaintiff's comment that Blackburn failed to notify its students.  The cited part of the deposition states the following in response to a question regarding Mr. Ober's understanding of the requirement of timeliness of reporting:  "We have a notification system that e-mails, text messages, and calls your phone, cell phone, your regular phone in your room, and again your e-mail, and lets you know if there is an emergency or some kind of incident on campus that you need to be aware of."

[6] The Fourth Circuit took a more strict view in Baynard v. Malone, 268 F.3d 228, 238 (4th Cir. 2001), when it stated "Title IX liability may be imposed only upon a showing that

harassing conduct need not be "plaintiff specific" and that the "actual knowledge" element may also be satisfied if the plaintiff can show an appropriate school official had actual knowledge of a substantial risk of abuse of students.  See Delgado, 367 F.3d at 672 (recognizing that, "in Davis the Court required knowledge only of 'acts of sexual harassment' by the [harasser], not of previous acts directed against the particular plaintiff" (citation omitted)); Hansen, 551 F.3d at 605-06 (stating a school official need not have actual knowledge of a teacher's acts directed at a particular plaintiff and that, instead, the school district might be found to have actual knowledge of a teacher's misconduct and that students may be at great risk if the teacher was "known to be a serial harasser"); Escue v. N. Okla. Coll., 450 F.3d 1146, 1153 (10th Cir. 2006) (stating that because "actual knowledge of discrimination in the recipient's program is sufficient, . . . harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX"); Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir. 2007) (school officials' knowledge of the harasser's past sexual misconduct at several schools, committed against people other than the plaintiff, was relevant to whether a Title IX claim had been stated).

---

school district officials possessed actual knowledge of the discriminatory conduct in question."

At least one court has found university officials had actual knowledge of the risk of sexual assault based on a football program's history of sexual assaults, rather than prior misconduct by a particular harasser.  See Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1181-84 (10th Cir. 2007) (school officials were on notice of risks associated with the football program because of numerous prior incidents, involving football players and recruits).  However, the Parties have not cited, nor has the Court's research found, a case where a court has found a school liable under Title IX for a sexual assault where the assailant was unknown and there were no prior similar acts of sexual assault attributed to an unknown assailant.

Under these circumstances, whether the unknown attacker was a student is of no moment because the Court concludes Blackburn did not have the actual notice required by Title IX.  Before Plaintiff was assaulted, Blackburn had notice of two prior sexual assaults against students in 2004, but the attackers in both those assaults had been  identified.  Not until after Plaintiff's assault did Blackburn learn of the prior assault of another student by an unknown assailant.  Given these facts, the Court concludes that Blackburn had no actual knowledge of any substantial risk of sexual assault to Plaintiff.

This conclusion is supported by Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d. 1052 (D.N.M. 2010).  In Schaefer, the parents of a minor child

attempted to hold a school district liable for sexual harassment of the child by an unknown student. The plaintiffs alleged that because the defendant school district knew of three prior incidents of one student harassing another, at least one of which was arguably a sexual assault, the school district was on notice that sexually assaultive behavior was occurring yet took no action. Id. at 1079. The Schaefer court held that the school district could not have known about the sexual harassment of the victim because the only assault on the victim had not yet occurred. Id. The Schaefer court went on to note that while the Tenth Circuit had not resolved the issue, district courts have differed as to whether prior complaints of harassment as opposed to notice of the current harassment for which redress is sought triggers liability under Title IX. Id. (citing Rost ex. rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d. 1114, 1119 (10th Cir. 2008)).

In Schaefer, the harasser was "an unknown student whom the [plaintiffs] [did] not allege to be the same harasser responsible for the prior three incidents. To hold the [d]efendants liable would be to punish them for failure to prevent a sexual assault by this student before it occurred." Schaefer, 716 F. Supp. 2d. at 1079. The Schaefer court discussed the fact that the plaintiffs relied on cases that all dealt with a known individual who had repeatedly engaged in harassment of one or more victims, and which harassment was known to one or more school officials.

Id.  The court was "not comfortable" with finding that an assault by one student of another student is sufficient to provide the defendants with actual knowledge of the impending sexual assault of the plaintiff in that case by an unknown student.  Id. at 1080.  The court noted that:

> [T]he steps necessary to stop a known perpetrator from assaulting students–or, in the case of a student-perpetrator, other students–are more straightforward and can be implemented as soon as the necessary school officials are notified of the harassing conduct.  The steps necessary to stop random assaults by one student against another are often of institutional magnitude and may take multiple steps to implement.  Furthermore, institutions may attempt to remedy the problem through a policy of individualized punishment, using specific and general deterrence principles, rather than through the kind of hall-monitoring that the Schaefers appear to desire.

Id.

The court concluded its interpretation was consistent with the Supreme Court's use of the phrase "actual knowledge" as opposed to "constructive knowledge," "knowledge," or "notice."  Id.  (citing Davis, 526 U.S. at 642).  The court further stated:

> Because the alleged sexual assault in this case had not yet occurred, no official could have had actual knowledge of it; only when sexual harassment is ongoing and the school officials learn of it can the officials be said to have actual knowledge of the harassment.  The Defendants had actual knowledge of three prior incidents of sexual assault by different assailants against different victims, but the most that can be said about the sexual assault to which AS was the victim–the only assault for which the Schaefers seek a remedy–is that the Defendants were put on notice that it was a possibility.  Until the incident occurred, there was no sexual assault of AS.  Neither the

Supreme Court nor the Tenth Circuit have said that a school district
would be liable if it was aware that sexual harassment could, might, or
would likely occur in the future–any one of which could arguably
encompass the facts that the Schaefers have pled.  Instead, the
Supreme Court and the Tenth Circuit maintain that a school district
can be liable under Title IX where it is "deliberately indifferent to
sexual harassment, of which [it] ha[s] actual knowledge, that is so
severe, pervasive, and objectively offensive that it can be said to
deprive the victims of access to the educational opportunities or
benefits provided by the school."  Davis v. Monroe County Bd. of
Educ., 526 U.S. at 642, 119 S.Ct. 1661.  Because the Defendants did
not have actual knowledge of any sexual assault of AS before it
occurred, the Court finds that the Defendants cannot be liable to the
Schaefers under Title IX.

Id. at 1080–81.

Plaintiff, like the plaintiffs in Schaefer, claims Blackburn was on notice

because of prior instances of sexual harassment on campus, including a sexual

assault in a dormitory, and took little or no action.  However, this Court agrees

with the Schaefer court's view and concludes the prior incidents on Blackburn's

campus, none of which had common perpetrators and all of which had known

perpetrators, did not give  Blackburn actual notice of the impending random sexual

assault of Plaintiff by the unknown assailant.  Therefore, the Court concludes the

actual knowledge requirement outlined in Davis is not satisfied here.  See Davis,

526 U.S. at 642–44.  Blackburn cannot be liable to Plaintiff under Title IX for the

sexual assault of Plaintiff because Blackburn was not "deliberately indifferent to

sexual harassment, of which [it] had actual knowledge" in such a way to "cause

[Plaintiff] to undergo harassment or make [her] liable or vulnerable to it." <u>See</u> <u>id.</u> at 645, 650 (internal quotation marks omitted).

Nor did Blackburn have an "institutional policy of indifference" as pressed by Plaintiff. Plaintiff cites <u>Murrell v. Sch. Dist. No. 1, Denver, Colo.</u>, 186 F.3d 1238 (10th Cir. 1999), and claims Blackburn had an "institutional policy of indifference" because Blackburn had knowledge that its security program was inadequate, had knowledge that lighting on campus was inadequate, and had knowledge of the prior on-campus incidents already discussed above but did not notify students of those incidents. However, to the extent that <u>Murrell</u> implies that actual notice is not required, the Court respectfully disagrees.[7] A policy of indifference necessarily implies actual notice of a substantial risk. The undisputed facts do not show Blackburn had actual knowledge of a substantial risk of the sexual assault of Plaintiff.

Finally, other than saying Blackburn did not inform students of the prior

---

[7] No court in the Seventh Circuit has used the <u>Murrell</u> court's "institutional policy of indifference" language in any case, let alone to impose liability under Title IX for the failure to prevent a sexual assault by an unknown person before it occurs. In fact, a Westlaw search (last performed on February 24, 2012) of all federal cases using the search terms "institutional policy of indifference" and "Title IX" yielded only 6 results. <u>See</u> <u>Murrell</u>, 186 F.3d at 1250 n.7; <u>Schaefer</u>, 716 F. Supp. 2d at 1069 (citing <u>Murrell</u>); <u>Garcia ex rel. Marin v. Clovis Unified Sch. Dist.</u>, 2009 WL 2982900, at *11 (E.D. Cal. 2009) (citing <u>Murrell</u>); <u>Garcia ex rel. Marin v. Clovis Unified Sch. Dist.</u>, 627 F. Supp. 2d 1187, 1199 (E.D. Cal. 2009) (citing <u>Murrell</u>); <u>Doe v. Ohio State Univ. Bd. of Regents</u>, 2006 WL 2813190, at *12 (S.D. Ohio 2006) (citing <u>Murrell</u>); <u>Simpson v. Univ. of Colorado</u>, 372 F. Supp. 2d 1229, 1235 (D. Colo. 2005) (citing <u>Murrell</u>). The Court notes also that the plaintiff in <u>Murrell</u> alleged actual notice.

incidents of alleged sexual misconduct, Plaintiff has submitted no evidence

indicating how Blackburn reacted to these prior incidents, and her conclusory

allegations that the response was inadequate are insufficient to create an issue of

fact on the issue. Moreover, Plaintiff has not shown how Blackburn's alleged

inadequate response to these unrelated incidents that occurred in different contexts

than her assault made her more vulnerable to the sexual assault. See Ross v. Corp.

of Mercer Univ., 506 F. Supp. 2d 1325, 1356 (M.D. Ga. 2007) (stating the court

could not find the university acted with deliberate indifference toward three prior

incidents of forcible sex offenses when the plaintiff submitted no evidence

indicating how the university reacted to the incidents and finding there was no

evidence the university's response to those instances of sexual harassment made

the plaintiff more vulnerable to her alleged attack).

*ii. Blackburn Cannot Control an Unknown Harasser Under these Circumstances*

Moreover, this claim cannot survive summary judgment because Plaintiff

cannot show Blackburn had control over the harasser. Under Davis, "[d]eliberate

indifference makes sense as a theory of direct liability under Title IX only where

the funding recipient has some control over the alleged harassment. A recipient

cannot be directly liable for its indifference where it lacks the authority to take

remedial action." 526 U.S. at 644. The Court further stated that a recipient's

damages liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.  Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs."  Id. at 645.

While Plaintiff believes the unknown assailant to be a Blackburn student, Plaintiff admits the identity of the assailant is unknown.  Barring any unforeseen circumstances, we never will know the assailant's identity.  Courts have held schools did not have control over the harasser and the context in which the harassment occurred in situations where the assailant was not affiliated with the school and the assault did not occur on campus.  See Tyrell v. Seaford Union Free Sch. Dist., 792 F. Supp. 2d 601, 629 (E.D.N.Y. 2011) (holding the defendant school district did not have control over either the alleged assailant who was not a student of that school district or the context in which the conduct occurred when the assault occurred off of school grounds); Mattingly v. Univ. of Louisville, No. 3:05CV-393-H, 2006 WL 2178032, at *4 (W.D. Ky. July 28, 2006) (university could not be liable under Title IX where the university had no authority to take remedial action or to punish the perpetrator or control his behavior in any way because alleged harasser was not a student of the university, had no connection to

the university, and was not subject to the university's rules or disciplinary procedures). However, the Parties have not cited, nor has this Court been able to find, a Title IX case addressing the issue of control where a single assault by an unknown assailant occurred on campus. Given that <u>Davis</u> instructs that a school cannot be deliberately indifferent if it lacks authority to take remedial action, this Court cannot find that Blackburn had control over the harasser when the identity, and whether he is even a student, is unknown. Under these circumstances, a school cannot take such action.[8]

### 3. Blackburn's Response to the Sexual Assault of Plaintiff was not Deliberately Indifferent or Clearly Unreasonable

Plaintiff argues that Blackburn was "deliberately indifferent" in its response to the alleged assault on Plaintiff and that Blackburn's response subjects it to liability under Title IX. As stated, federal fund recipients will only be deemed deliberately indifferent if their "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Davis</u>, 526 U.S. at 648. In essence, Title IX's premise "is an official decision by the recipient not to remedy

---

[8] The Court makes no comment on the hypothetical situation where an unknown person or nonstudent had assaulted Blackburn students on more than one occasion, the school had knowledge of these assaults, and yet the school took no steps to protect its students. <u>See</u> <u>Mattingly</u>, 2006 WL 2178032, at *5 (setting forth similar hypothetical but declining to comment on the school's liability in such a situation). That is not the situation the Court is faced with in this case.

the violation." <u>Gebser</u>, 524 U.S. at 290.

Blackburn was not indifferent to the sexual assault of Plaintiff once knowledge of it came to light. Plaintiff admits that Blackburn's college counselor met with Plaintiff the night of the alleged assault and counseled her 8 to 10 times following the assault; Blackburn held town hall meetings after the assault with students regarding safe practices, and Plaintiff went to one; and the counselor and Dean of Students met with Plaintiff and offered the counselor as a resource for dealing with any issues Plaintiff might have and to talk about off-campus resources available to Plaintiff in dealing with the alleged assault. Moreover, Blackburn attempted to make arrangements with Plaintiff to complete her coursework which were apparently thwarted by Plaintiff's counsel. Even assuming Plaintiff was told Blackburn could not protect her, which Blackburn disputes, Blackburn's response was not clearly unreasonable in light of the known circumstances.

### 4. *The Lone Incident With Mr. Miller Does Not Subject Blackburn to Liability Under Title IX*

To the extent Plaintiff is attempting to use Mr. Miller's comment that he was dying to kiss her to show she was sexually harassed by Mr. Miller or that this one statement somehow subjects Blackburn to liability under Title IX, the Seventh Circuit has recognized that a plaintiff may not advance a new argument or claim in response to summary judgment. <u>Andree v. Ashland Cnty.</u>, 818 F.2d 1306, 1314

n.11 (7th Cir. 1987). In any event, to the extent Plaintiff is attempting to show this statement created a hostile educational environment, which somehow contributed to her assault, she has not made that connection. Plaintiff has not met her burden of showing the conduct is "so severe, pervasive, and objectively offensive" that it undermined and detracted from her educational experience so that she was effectively denied equal access to Blackburn's resources and opportunities. Milligan v. Bd. of Trs., No. 09-cv-320, 2010 WL 2649917, at * 9 (S.D. Ill. June 30, 2010). In fact, Plaintiff stated she does not believe the statement was in any way related to her sexual assault and she had no further issues with Mr. Miller. There are no facts that show Plaintiff's grades suffered, that her learning environment changed in anyway, or that she was foreclosed from any educational opportunity at Blackburn as a result of this incident. See Milligan, 2010 WL 2649917, at *10. In fact, Plaintiff laughed off the suggestion, Mr. Miller backed down, and "nothing ever happened."

### 5. Plaintiff's Title IX Sex Discrimination Claim Is Duplicative of Her Title IX Sexual Harassment Claim

Blackburn claims that Plaintiff's sex discrimination claim under Title IX fails for the following reasons: (1) an improper grievance policy does not establish a Title IX claim, and (2) Plaintiff's sex discrimination claim is duplicative of the sexual harassment claim. Plaintiff acknowledges an improper grievance procedure

does not itself constitute a Title IX violation.  However, Plaintiff then states "a question of fact remains as to whether Blackburn went far beyond an improper grievance procedure in its response to Plaintiff being raped."  Plaintiff supports her contention that a sexual discrimination claim could survive, even if the sexual harassment claim did not, by listing facts related to Blackburn's lack of security improvements in the years leading up to the assault.  The Court cannot discern a difference between the two claims.  Both claims allege Blackburn is liable under Title IX for the failure to prevent the sexual assault and on Blackburn's response to the assault.  Therefore, Plaintiff's Title IX sex discrimination claim is stricken as duplicative of her Title IX sexual harassment claim.  <u>See</u> <u>Doe 20</u>, 680 F. Supp. 2d at 972 (where the court recommended striking a Title IX hostile educational environment claim as duplicative of a Title IX discrimination claim because the claims were based on identical theories of relief).

For these reasons, Blackburn's Motion for Summary Judgment is granted.

### III.  SUPPLEMENTAL JURISDICTION

The Court notes that the only claims remaining in this case against Blackburn are state law claims.  Section 1367(a) provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the

action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  District courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Here, Plaintiff's Complaint alleged a cause of action based upon Title IX, which gave this Court original jurisdiction over the case.  However, summary judgment has now been granted in favor of Defendant Blackburn on Plaintiff's only federal claims.  "'[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.'"  Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998) (quoting Wright v. Associated Ins. Cos., 29 F.3d 1244, 1251 (7th Cir. 1994)).  "Cases involving difficult and unresolved issues of state law may well be adjudicated more accurately and more expeditiously in a state court."  Barron v. Lee Enterprises, Inc., 183 F. Supp. 2d 1077, 1089 (C.D. Ill. 2002) (citing Centres, Inc. v. Town of Brookfield, Wis., 148 F.3d 699, 704 (7th Cir. 1998).  Moreover, "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, are paramount concerns."  Barron, 183 F. Supp. 2d

at 1089 (citing <u>Kennedy</u>, 140 F.3d at 728). Based upon these considerations, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## IV. CONCLUSION

THEREFORE, Defendant's Motion for Summary Judgment (d/e 118) is GRANTED. Plaintiff's remaining state law claims are DISMISSED WITHOUT PREJUDICE. Plaintiff may refile her state law claims in state court pursuant to § 13-217 of the Illinois Code of Civil Procedure (735 ILCS 5/13-217). This case is CLOSED.

IT IS SO ORDERED.

ENTER: February 24, 2012.

FOR THE COURT:                      s/ Sue E. Myerscough
                                    SUE E. MYERSCOUGH
                                     United States District Judge